In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2541 & 99-2758

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MICHAEL A. ROE,

Defendant-Appellant.

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 98 C 3946--Barbara B. Crabb, Judge.

Argued January 21, 2000--Decided April 11, 2000

Before BAUER, RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.  A jury found Michael Roe guilty of conspiring to distribute cocaine in violation of 21 U.S.C. sec. 846. The district court held Mr. Roe responsible for conspiring to distribute 623 grams of cocaine and based his sentence on that amount. On this appeal, Mr. Roe seeks the reversal of his conviction. He contends that the district court improperly allowed the Government to enter evidence of his prior cocaine conviction and to make improper statements during closing argument. Mr. Roe also challenges the district court's sentencing decision. He contends that the court improperly determined the amount of cocaine attributable to him. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

I

BACKGROUND

Michael Roe was convicted of conspiring with Timothy Weger to distribute cocaine. There is no dispute that Weger was involved in the distribution of cocaine; he pleaded guilty to cocaine conspiracy and then testified against Mr. Roe at trial. A Madison, Wisconsin, police officer testified that he had found drug paraphernalia in Weger's trash, and more paraphernalia was found inside Weger's home.

Further, there is no dispute that Mr. Roe and Weger engaged in cocaine transactions with each other. Mr. Roe's defense at trial was that he was not a co-conspirator of Weger's, but instead was merely a customer. Weger testified that some of the paraphernalia at his house belonged to Mr. Roe.

At trial, the Government questioned Mr. Roe about his prior cocaine-related conviction. In 1989, Mr. Roe had pleaded guilty to possession of cocaine with intent to distribute. In addition to asking Mr. Roe about his prior conviction, the Government referred to the issue in its closing argument. After trial, the district court issued an opinion clarifying its basis for allowing this evidence under Federal Rules of Evidence 404(b) and 609. The court noted that Mr. Roe had put at issue the absence of cocaine paraphernalia at his own house. Therefore, this evidence helped explain why he would not keep such paraphernalia there but might instead keep it at Weger's house.

The Government made two comments during closing argument that Mr. Roe claims misstated the law. The first comment, to which Mr. Roe did not object at trial, was a statement of the law of conspiracy: "Basically what we have to do is prove to you that there was an agreement. That there was something going on between those two men, an agreement." R.98 at 57. The second statement was as follows:

Last point. Mr. Roe got up there and did a big deal about basically what was a role reversal. "I'm not the source. I'm the customer. Tim's the source." It's total poppycock, but believe it if you will. He's still guilty. Just reversing the roles doesn't get you out of the conspiracy. Whether one guy is a source and one guy is the customer who's selling, or the other way around, it's still, you're in a conspiracy.

R.98 at 110. Mr. Roe did make a contemporaneous objection to this statement, and the district court told the jury that only the court could instruct the jury as to the elements of a conspiracy charge.

At sentencing, the district court attributed 623 grams of cocaine to Mr. Roe. The district court had relied on several pieces of evidence in arriving at this amount. Timothy Weger had testified about the amount of cocaine he saw Mr. Roe handle. Tina Weger, Timothy Weger's wife, had testified about a pile of cocaine she saw Mr. Roe weighing in the Weger basement and had made hand motions to demonstrate the size of the pile. Further, the Government had introduced evidence that the cocaine it took from the Weger house was 45% pure and evidence of empty bottles found in

the house that had contained 10 ounces of inositol, a cocaine cutting agent. From the purity of the cocaine and the amount of inositol used, the district court determined that over a pound of cocaine was involved in the conspiracy.

## II

## DISCUSSION

### A.

Mr. Roe's first contention is that the district court improperly admitted evidence of his 1989 conviction for conspiracy to distribute cocaine. Federal Rule of Evidence 404(b) allows the admission of evidence of other crimes, wrongs, or acts under certain circumstances./1 For evidence to be admissible under Rule 404(b), it must meet four requirements:

(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

United States v. Asher, 178 F.3d 486, 492 (7th Cir.), cert. denied, 120 S. Ct. 359 (1999); United States v. Brooks, 125 F.3d 484, 499-500 (7th Cir. 1997). We review the district court's decision to admit evidence pursuant to Rule 404(b) for an abuse of discretion. See United States v. Robinson, 161 F.3d 463, 466 (7th Cir. 1998), cert. denied, 119 S. Ct. 1482 (1999); United States v. Smith, 103 F.3d 600, 602 (7th Cir. 1996).

Mr. Roe argues first that the district court did not properly engage in the four-part inquiry required, and therefore that it has abused its discretion. See United States v. Nagib, 56 F.3d 798, 806-07 (7th Cir. 1995). It is true that the district court's order does not discuss explicitly all four factors. On this record, however, we do not believe that the district court abused its discretion. The district court's post-trial clarifying order gives us a sufficient basis for appellate review.

### 1.

First, we must consider whether the evidence was

directed toward establishing a matter in issue other than Mr. Roe's propensity to commit cocaine-related crimes. The district court, in its post-trial order, said that the earlier conviction showed Mr. Roe's motive for not having drug paraphernalia at his house. It added that the conviction also helped to explain "the unusual fact that [Mr. Roe] did not put any trash out at the curb in front of his residence for collection by municipal crews." R.70 at 2. Mr. Roe had admitted on cross-examination that his prior conviction for cocaine distribution taught him not to keep drug paraphernalia at his residence.

We believe the district court fairly characterized the absence of cocaine at Mr. Roe's house as a matter at issue. As part of his case, Mr. Roe offered testimony from Madison Police Department Detective Rolly Squire, who said that no drug paraphernalia was ever found at Mr. Roe's house. Squire also testified that police officers were instructed to search Mr. Roe's trash, but that Mr. Roe never put out any trash. The prior conviction was relevant in explaining Mr. Roe's motive for not leaving any trash on the curb.

2.

Second, we must consider whether the acts were similar enough and close enough in time. The district court described the prior conviction as being for "essentially the same conduct." R.70 at 2. Mr. Roe correctly points out that the district court's order did not address the issue of the time lag between the cases. However, in upholding the exercise of discretion by district courts, we have allowed the admission of Rule 404(b) evidence with greater temporal gaps than the one at bar. See United States v. Tringali, 71 F.3d 1375, 1379 (7th Cir. 1995) (1984 cocaine trafficking conviction introduced at trial for drug deals in 1994); United States v. Wimberly, 60 F.3d 281, 285 (7th Cir. 1995) (child molestation conviction 13 years earlier). Therefore, we decline to find an abuse of discretion in the decision to admit evidence of the 1989 conviction in a trial for offenses allegedly committed in 1996.

3.

As for the third element, Mr. Roe admits that he was convicted of a crime. His argument on this point is that the Government did not establish the exact facts surrounding the earlier conviction. In this case, the fact of conviction is all that is necessary to show that Mr. Roe had a reason to keep drug paraphernalia out of his house. The desire to act in a manner calculated

to avoid a second conviction for distributing cocaine would not be dependent on the details underlying the prior conviction. Because the conviction itself is undisputed, we do not find error on this ground. See Tringali, 71 F.3d at 1379 (finding third factor satisfied because defendant was "actually convicted").

4.

Finally, the district court balanced, under Federal Rule of Evidence 403, the probative value of the evidence against its potential for unfair prejudice. The district court acknowledged that the similarity of the 1989 conviction to the instant proceeding would be prejudicial, but found that its probative value outweighed the prejudice. "A district court's Rule 403 balancing is afforded a special degree of deference: only in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge." United States v. Robbins, 197 F.3d 829, 843-44 (7th Cir. 1999) (quoting United States v. Dillard, 43 F.3d 299, 305 (7th Cir. 1994)). The district court explained the probative value of the evidence, and we share its view that the evidence was in fact probative. We shall not second-guess the district court's decision that the probative value of this evidence outweighed any unfair prejudice to Mr. Roe.

In conclusion, Mr. Roe's prior conviction satisfied all four of the required elements under Rule 404(b). In evaluating a district court's decision to admit evidence under Rule 404(b), we accord the district court's decision great deference. See Asher, 178 F.3d at 494; United States v. Stevenson, 942 F.2d 1111, 1117 (7th Cir. 1991); United States v. Parkin, 917 F.2d 313, 317 (7th Cir. 1990). In this case, the district court did not abuse its discretion in admitting the evidence of Mr. Roe's prior conviction.

B.

Mr. Roe also claims reversible error because of two statements made by the prosecutor at closing argument. To evaluate this claim, we first must look at the remarks in isolation to determine if they were improper. See United States v. Brisk, 171 F.3d 514, 524 (7th Cir.), cert. denied, 120 S. Ct. 150 (1999); United States v. Lovelace, 123 F.3d 650, 655 (7th Cir. 1997), cert. denied, 522 U.S. 1132 (1998). If they were improper, we examine them in light of the record as a whole, to determine whether the defendant was deprived of a fair trial. See Brisk, 171 F.3d at 529; Lovelace, 123 F.3d at 655. We review the district

court's decision that the defendant was not deprived of a fair trial for an abuse of discretion. See United States v. Miller, 199 F.3d 416, 422 (7th Cir. 1999); United States v. Rivera, 153 F.3d 809, 814 (7th Cir. 1998). When the defendant has failed to object contemporaneously to the remarks, we review only for plain error. See Rivera, 153 F.3d at 814; United States v. Rose, 12 F.3d 1414, 1422 (7th Cir. 1994).

1.

The first statement that Mr. Roe claims is erroneous is one to which he did not object at trial, and therefore our review is for plain error. Mr. Roe, in his brief to this court, claims that the prosecutor misstated the law by telling the jury "that all the government had to show to establish the conspiracy was '[t]hat there was something going on between those two men.'" Appellant's br. at 15 (quoting R.98 at 57).

At the outset, it is important to evaluate the prosecutor's remark in context. The complete statement made by the prosecutor was as follows:

First of all, what you've got on the ELMO there are the elements. That's the jury instruction that Judge Crabb is going to read to you. There's two elements in a conspiracy. One, the government has to prove that the conspiracy, as we charted it in the Indictment, existed. Basically what we have to do is prove to you that there was an agreement. That there was something going on between these two men, an agreement. That's the first thing we have to do. The second thing we have to do is show that the defendant knowingly became a member of that conspiracy with an intent to further it. We have to show membership or joining in the conspiracy.

R.98 at 57. The prosecutor told the jury that the first element of the conspiracy was met by an agreement between Weger and Mr. Roe; the second element was met by Mr. Roe's knowingly joining the conspiracy with an intent to further its aims. There was no misstatement of the law. We have explained the elements of a conspiracy under 21 U.S.C. sec. 846 as follows:

In order to prove a conspiracy conviction, the government must provide substantial evidence that a conspiracy existed and that the defendant knowingly agreed to join that conspiracy. The government may establish each element of a conspiracy through circumstantial evidence. With respect to the first element, an agreement, the government need not establish a formal agreement to conspire.

United States v. Turner, 93 F.3d 276, 281-82 (7th Cir. 1996) (citations omitted and emphasis added). The prosecutor's statement was consistent with the law of conspiracy as explained by this court. Therefore, these remarks were not improper.

2.

The second remark that Mr. Roe claims was erroneous is one to which he did object at trial. We thus review the district court's decision not to grant a mistrial based on this comment for an abuse of discretion. We repeat the comment made by the prosecutor:

Last point. Mr. Roe got up there and did a big deal about basically what was a role reversal. "I'm not the source. I'm the customer. Tim's the source." It's total poppycock, but believe it if you will. He's still guilty. Just reversing the roles doesn't get you out of the conspiracy. Whether one guy is a source and one guy is the customer who's selling, or the other way around, it's still, you're in a conspiracy.

R.98 at 110. Mr. Roe argues that, because his defense was that he was merely a customer of Weger's, this statement, which he says is a misstatement of the law, unfairly prejudiced him before the jury.

This remark was not a misstatement of the law. The two actors in the final sentence quoted are a "source" and "the customer who's selling." Fairly read in its entirety, the prosecutor's statements did not imply that a mere customer was a member of a conspiracy, only the customer of a source who then re-sells to others. In effect, the prosecutor said that, even if Mr. Roe was not Weger's source--as Weger had testified he was-- Mr. Roe could still be found guilty of a conspiracy if Mr. Roe purchased cocaine from Weger for resale to others, rather than for personal use. Although the simple act of buying cocaine does not create a conspiracy between a buyer and a seller, a conspiracy may be found when the seller understood that the buyer intended to resell the drugs to others. See United States v. Brack, 188 F.3d 748, 760 (7th Cir. 1999).

Although this remark was not improper, we also note that the district court acted quickly to remedy any confusion that might have arisen. When the statement was made, the district court responded to Mr. Roe's objection by telling the jury that it would provide proper instructions on the elements of conspiracy. Mr. Roe has not

argued to this court that any of the jury instructions were erroneous. We do not believe that any statements by the prosecutor in closing arguments unfairly prejudiced Mr. Roe.

C.

1.

Mr. Roe also submits that the district court overstated the amount of cocaine attributable to him. The district court held Mr. Roe responsible for 623 grams (21.8 ounces) of cocaine. Under 21 U.S.C. sec. 841(b)(1)(B)(ii)(I), the statutory minimum sentence for distributing more than 500 grams of cocaine is 5 years, but that minimum is increased to 10 years if the offender has a previous conviction. Thus, when the district court found Mr. Roe responsible for 623 grams of cocaine, it sentenced him to 10 years' imprisonment.

The district court's determination of the amount of cocaine attributable to Mr. Roe is ultimately a factual one that we shall review only for clear error. See United States v. Jean, 25 F.3d 588, 598 (7th Cir. 1994). Such a review is not, however, a toothless one. We cannot uphold a sentence based on unreliable information. See United States v. Humphrey, 154 F.3d 668, 671 (7th Cir. 1998); United States v. Burke, 148 F.3d 832, 836 (7th Cir.), cert. denied, 119 S. Ct. 572 (1998). Testimony from informants who are former drug addicts must be subject to special scrutiny. See United States v. Beler, 20 F.3d 1428, 1432 (7th Cir. 1994). On the other hand, in our assessment, we must remain aware of the practical difficulties that confront the district court as it makes this crucial determination. In determining the amount of contraband involved, the district court often must deal with evidence that is stated with less than laboratory-standard precision. Rather than rely upon the precise tools of the scientist to ascertain the amount involved, the district court must rely on its own skills of critical assessment of testimonial and circumstantial evidence. Here, our cases demonstrate that an articulated methodology for assessment, combined with thoroughness in the execution of that methodology, usually signal that the district court has made the sort of reasoned decision that ought not be disturbed on appeal. As we noted in United States v. Duarte, 950 F.2d 1255 (7th Cir. 1991), although the district court's determinations need not "emulate the precision of Newtonian physics," they also may not be based on "nebulous eyeballing." Id. at 1265.

Our review of the record convinces us that the

district court well understood the issues that needed to be resolved in determining the amount of cocaine that ought to be attributed to Mr. Roe. It articulated a decisional matrix for assessing those issues and then carefully assessed the evidence before the court. The initial presentence report recommended a finding that Mr. Roe had dealt 623.7 grams of cocaine based on two separate factual components: (1) Timothy Weger had been held responsible for 170 grams at his own sentencing, and had testified that Mr. Roe had delivered that cocaine to him over the course of six months; and (2) Weger also testified that, in early April, he saw Mr. Roe repackaging an additional pound of cocaine./2 The district court carefully considered the evidence submitted with respect to both of these components. Central to the district court's analysis of both of these components was the testimony of Timothy Weger. The court did not accept that testimony blindly; it candidly noted that there were some discrepancies and, in evaluating those discrepancies, sought corroboration in other circumstantial evidence.

2.

With respect to the 170 grams that Timothy Weger said Mr. Roe had delivered over a six-month period, the court noted that Weger had been unable to remember exactly how much cocaine he had in his possession at different times. The court therefore considered other circumstantial evidence with respect to that amount. It considered Tina Weger's testimony that she "saw Mr. Roe weighing out a quantity of cocaine sufficient to fill a soft drink can in December." R.101 at 57. In a later order, the court also described Tina Weger as having seen Mr. Roe with a "'Coke can' sized pile of cocaine." R.87 at 2. Mr. Roe now argues that the district court incorrectly recalled the trial testimony of Tina Weger.

At trial, Tina Weger, when asked how much cocaine she saw Mr. Roe weighing on a scale in the basement of her home, made a hand gesture that the court described as holding her thumbs and first fingers together. Tina Weger then responded, "It was more. It filled the whole scale. I don't know how big it is. I don't know how big, but it looked--or from here I mean it looked like it was a nice-sized pile." R.96 at 24. The district court used terminology different from Tina Weger's in describing the amount of cocaine. That difference does not make its finding of facts clearly erroneous. "We defer to the sentencing judge's credibility determinations because the presiding judge while listening to the witnesses' testimony is in the best position

to observe, weigh, and evaluate a witness' verbal as well as nonverbal behavior." United States v. Pitz, 2 F.3d 723, 727 (7th Cir. 1993); see also United States v. Magana, 118 F.3d 1173, 1205 (7th Cir. 1997) (quoting Pitz), cert. denied, 522 U.S. 1139 (1998). The district court, after observing Tina Weger's gesture and seeing the scale to which she was referring, simply described in graphic terms what it had seen.

In determining the extent of Mr. Roe's cocaine dealing between November 1995 and April 1996, the district court also found corroborative the number of baggies for packaging cocaine that had been found in Timothy Weger's trash. Weger had testified that baggies were used to package either 1/16 ounce or 1/8 ounce quantities. The district court concluded that, even if all the baggies were used to package the lesser amount, three ounces (84 grams) would have been packaged in a two-month time period. This rough calculation, standing alone, would indeed be a thin reed upon which to support a quantity determination. Here, however, the court simply employed this observation as a rough measuring stick of the volume of cocaine involved in the transactions in an effort to corroborate the testimony of Weger. We cannot say that the district court abused its discretion in using this approach. Nor can we say that the district court was wrong in its estimation that the 170 gram figure was "extremely conservative." R.101 at 56-57.

3.

The district court similarly engaged in a careful process of evaluating Timothy Weger's testimony concerning the amount of cocaine possessed by Mr. Roe on April 4. It noted that there were some inconsistencies. When asked at trial how much cocaine Mr. Roe had on the night of April 4, 1996, Weger said, "I don't know the exact amount." R.72 at 37-38. However, at both the trial and at the sentencing hearing, he testified that, on April 4, he saw Mr. Roe with two bags of cocaine that he would estimate weighed four ounces, two bags that he estimated weighed two ounces, seven or eight 1/8 ounce bags, and one ounce left at the end of the night for Weger's personal use. As Weger acknowledged, there was an inconsistency between his trial testimony and his testimony at the sentencing hearing: At trial, he stated that on April 4 he saw Mr. Roe with three "one-ouncers"; at the sentencing hearing, he said he saw Mr. Roe with only one. Including the ounce left for Weger, the sum total of the cocaine involved would be a total of either 17 ounces (485.7 grams) or 15 ounces (428.6 grams), depending on which version

is credited. The district court finally characterized Mr. Weger's testimony as "unwavering" that "he saw approximately 16 ounces of cocaine bagged up that evening." R.101 at 58 (emphasis added).

As it had with respect to the quantity of cocaine involved in the six month period, the court took into account corroborating evidence in determining the appropriate assessment of Weger's testimony. It credited Timothy Weger's statements that Mr. Roe had possessed 1 pound (457.1 grams) in his basement on April 4. The court noted that Weger was accustomed to seeing a variety of smaller quantities of cocaine and, therefore, would be able to estimate accurately the amount of cocaine in a larger pile. Additionally, the court pointed out that approximately 10 ounces of inositol had been used in preparing the cocaine. Mr. Roe does not dispute that the cocaine found at the Weger residence was 45% pure. A cocaine mixture of 45% purity containing 10 ounces of inositol would weigh 18.18 ounces, or 519.48 grams./3 We think the district court was entitled to conclude that it was "practically indisputable" that there was "at least a pound of cocaine involved." Id.

In determining the amount of cocaine involved in the conspiracy, the district court credited Timothy Weger's testimony after a thoughtful examination of its contents and an evaluation of the corroborating evidence. In proceeding in this manner, it employed an acceptable methodology in cases where there may be questions about the credibility of an addict witness. See United States v. Taylor, 72 F.3d 533, 544 (7th Cir. 1995). On appellate review, we shall disturb a sentence only if we cannot find any evidence in the record to support it and are left with a definite and firm conviction that a mistake has been made. See United States v. Joiner, 183 F.3d 635, 640 (7th Cir. 1999); United States v. Gabel, 85 F.3d 1217, 1221 (7th Cir. 1996). The evidence in this case is sufficient to support the district court's finding.

Conclusion
For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED


/1 The Rule reads as follows:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however,

be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).

/2 A later revision to the presentencing report recommended that Mr. Roe be held responsible for only 396.9 grams, but that revision offered no explanation for its new conclusion and the district court did not rely upon it.

/3 Mr. Roe suggests that the cocaine originally delivered to Weger's house may not have been 100% pure; he points out that there is no testimony that the cocaine delivered to the house was of high purity. However, if we assume that the cocaine to which the 10 ounces of inositol were added was not 100% pure, this consideration only raises the amount of cocaine mixture involved in the conspiracy. As we noted above, assuming that the inositol was added to 8.8 ounces of 100% pure cocaine, adding 10 ounces of inositol to create a mixture of 45% purity creates a cocaine mixture of 18.18 ounces. Reducing the purity of the original cocaine to which the inositol was added, but maintaining the acknowledged constants of 10 ounces of inositol and a final mixture that is 45% pure, increases the weight of the original cocaine mixture.